UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

PIATT LAKE BIBLE
CONFERENCE ASSOCIATION,

    Plaintiff,

v.

CHURCH MUTUAL INSURANCE CO.,

    Defendant.

_____/

CASE No. 2:23-cv-73

HON. ROBERT J. JONKER

### OPINION AND ORDER

**INTRODUCTION**

In 2020, the Piatt Lake Bible Conference Association's "Miracle Building" collapsed due to heavy snow and ice. There was no replacing the lodge's sentimental value, but there was still a need to rebuild the lodge that had served as a multipurpose building and worship space for nearly fifty years. Like many property owners in such unfortunate circumstances, the first step for the association in moving forward was to submit a claim to its insurer, here Church Mutual Insurance Company. The association believed the $3.5 million replacement cost coverage in the policy it maintained with Church Mutual was more than enough to cover the cost of replacing the fairly modest lodge. The association was partially right—the total replacement cost for the Miracle Building was approximately $1 million less than the replacement cost cap contained in its policy with Church Mutual.

But the association could not simply erect a brick for brick, beam for beam replica of the Miracle Building. To actually construct the new lodge, the association had to account for the

various ordinances and building code requirements that were instituted in the years since the building's original construction in the 1970s. Code compliance costs for the new building—for things like a new concrete pad, heating, fire suppression, and septic—totaled well north of $1 million and were expressly not covered replacement costs under the policy. They were, rather, included under a separate policy provision with a separate, much smaller, cap of $100,000, leaving the association on the hook for the rest of those costs.

In this lawsuit, the association seeks to recover the code compliance costs the policy itself did not cover. The association admits that it cannot prevail under the policy's written terms. But it says that approximately one year before the collapse, Church Mutual assured the association it had "full coverage" in the event of loss. The association claims this assurance, combined with other considerations, created a "special relationship" between the association and Church Mutual that should permit it to recover in tort for the actual code compliance costs regardless of the policy's written terms. Church Mutual contends that no special relationship existed, but that even if it did, the association cannot demonstrate the requisite element of reliance that runs across all the pleaded tort claims. It moves for summary judgment on that basis. (ECF No. 53).

The Court heard argument on May 28, 2025, and thereafter took the motion under advisement. (ECF No. 58). For the reasons set out below, the Court grants the defense motion and dismisses this case.

## FACTUAL BACKGROUND

### 1. *The Association's Conference Grounds & Miracle Building*

Plaintiff Piatt Lake Bible Conference Association (the "association") is a nonprofit religious organization that owns approximately 3,500 acres of land in the Upper Peninsula of Michigan. The association's land holdings encompass Piatt Lake. (Bair Aff. ¶ 3, ECF No. 54-1,

PageID.1974). Members maintain cottages on the lake, and they typically gather for Bible conferences, youth camps, recreation, fellowship, and the like. (Welty Dep. 8, ECF No. 53-11, PageID.1729). Many years ago the association set aside land on the eastern side of Piatt Lake as conference grounds where approximately eighteen different structures are located. The structure that is central to this dispute is the Miracle Building. The Miracle Building had served as a multipurpose space for the association. It contained a worship space, dining hall, kitchen, conference rooms, and office space. (Bair Aff. ¶¶ 4-5, *supra* at PageID.1974).

Since at least the late 1970s, the buildings at the conference grounds—including the Miracle Building—were insured under a multi-peril insurance policy issued by Defendant Church Mutual Insurance Company. (*Id.* at ¶ 6). The buildings were initially insured in the name of the association's lessee—Hiawatha Youth Camp—and then in the name of the association. Church Mutual, as its name implies, holds itself out as specializing in insurance designed specifically for worship spaces and the various uses of those spaces. Church Mutual issued policies that were renewable every three years; and every three years the youth camp (with the association as a named insured), and then the association as primary, renewed its policy with Church Mutual. (Loos Dep. 14, ECF No. 53-6, PageID.1543). Based on the summary judgment record, there typically was little interaction between the insured and the insurer in the interim

Over the years the association and Church Mutual consistently renewed the insurance policy. During the 1990s and early 2000s, one individual—Dale Spencer—was both a youth camp board member and a Church Mutual agent. (Bair Aff. ¶ 9, ECF No. 54-1, PageID.1974). However, there is no further indication in the record about how Mr. Spencer balanced these positions, or what role—if any—he had in reviewing, renewing, or securing insurance coverage for the association or its lessee.

### *2. The Association's Insurance Review*

It appears that beginning in 2010, the association periodically performed internal reviews of its insurance policy with Church Mutual, and these reviews included meetings with Church Mutual's agents. These discussions went through different compositions of the association's board, and various agents of Church Mutual. Most of these discussions occurred years ago, and the summary judgment record—especially the deposition testimony—reflects fading and foggy memories of the past events.

Still, the record plainly shows that the association desired to review its insurance coverage and that it had discussions with Church Mutual about the policy terms—including the policy's provisions on replacement costs. At a high level, the available summary judgment record reflects the discussions about replacement costs pertained to the present appraised value of the buildings on the conference grounds, and whether the blanket replacement cost coverage would be sufficient to account for any increase in value in the event of loss. This is mainly where the parties stayed in their discussions. To the extent the discussions may also have covered whether the policy's coverage would be sufficient to pay all the costs to *rebuild* any of the covered buildings—as the association says in the briefing—the summary judgment record fails to support the association's position. Indeed, the deposition testimony of the two board members who were primarily responsible for conducting the association's insurance reviews reflects that they both understood replacement costs entailed getting back what the association already had—nothing more, and nothing less.

To be sure the argument in the briefing is that what the association also believed was that the covered "replacement costs" would be sufficient for the association to rebuild the structure in the event of loss. That is, to at least some in the association, "replace" meant more than "replicate"

4

and encompassed "rebuild," because the building could not be "replaced" without incurring these additional costs of rebuilding to current code requirements.  There is no dispute now, however, that this is not what the policy said.  Rather, the policy expressly provided that "[t]he cost to repair, rebuild or replace does not include the increased cost attributable to enforcement of any ordinance or law regulating the construction, use or repair of any property."  (ECF No. 53-4, PageID.1324).

Despite this clear and unambiguous policy language, the association faults the insurance company for not picking up on what the association says it really wanted and tried to communicate during conversations between board members and Church Mutual's agents about the association's coverage.  The section below summarizes the interactions in the three prior renewal cycles before the Miracle Building's collapse.  While the association points to all of this in support, during oral argument it centered on the last meeting in 2019 between Vicky Welty (the association's Board President) and Beth Kroeger (a Church Mutual agent) as the pivotal interaction.

### A. The 2010-2013 Coverage

For this term, the association points to an advertising brochure that Church Mutual issued around this time period called "A Passion for Protection."  (ECF No. 54-2).  In it, the insurer said it had a "Passion for Providing the Right Coverages."  (ECF No. 54-2, PageID.1984).  The insurer remarked that "*Our portfolio of coverages* has been formed by the knowledge and experience we have gained from focusing on a specific marketplace.  These coverages meet the unique needs of needs of religious organization and play a critical role in maintaining their financial viability."  (*Id.*) (emphasis in original).  To that end, the company detailed that "[o]ne of the first steps of our relationship is a detailed, on-site risk and insurance needs analysis.  Our specialists will measure your building(s) to establish replacement values based on current construction costs.  And we'll

5

ask about your programs and activities to identify exposures. The information we gather forms the basis of your customized proposal." (*Id.*).

There is no mention in the summary judgment record whether anyone at the association received this brochure, reviewed it, or relied on it in their decision making.

### B. The Association Conducts a Review in 2014

In 2014, the association asked Dennis Lintemuth—then a Board member and the association's treasurer—to conduct a comprehensive review of its insurance coverage. (Lintemuth Dep. 11-12, ECF No. 53-8, PageID.1671). Mr. Lintemuth reviewed the policy from what he said was a layperson's perspective. (*Id.* at 12). Then in April of that year he had a telephone call with Stephen Loos, the Church Mutual agent handling the association's account.

Before speaking with Mr. Loos, Mr. Lintemuth prepared an agenda with discussion topics that he sent via email to Mr. Loos. Mr. Lintemuth suggested that the two of them review the four policies that the association maintained with Church Mutual (Auto; Workers Compensation; Umbrella; and Multi-Peril) and he detailed several items for discussion under each policy. Under the multi-peril policy, Mr. Lintemuth asked whether Mr. Loos would "recommend we have 'replacement cost' on many of these building?" [sic] (ECF No. 53-9, PageID.1752). During his deposition Mr. Lintemuth testified that he wanted to be sure that there was enough coverage if there was a catastrophe. Would the replacement limit—approximately $3.4 million—be enough to cover the over dozen buildings on the conference grounds? In other words, his concern was that regardless of the limit on any particular building, the entirety of all the limits were available for any given loss. (Lintemuth Dep. 15-17, ECF No. 53-8, PageID.1672). Mr. Lintemuth further testified to his understanding of replacement costs at the time he prepared the agenda. He described such costs as "[t]hat the building would be replicated the same way as it was—same

6

square footage, everything the same." (*Id.* at 17). Notably he agreed that he understood that replacement costs would not include things like a sprinkler system if the building did not have a sprinkler system. (*Id.* at 17-18). Mr. Lintemuth did not go into specifics about the subsequent phone call during the deposition, but he testified that Mr. Loos told him that the policy did have replacement costs, and Mr. Lintemuth felt comfortable with his answer. (*Id.* at 16-17). Mr. Lintemuth followed up in October with another email. (ECF No. 53-10). Again, this conversation related to the cost of replacing what the camp actually had. (Lintemuth Dep. 21-22, ECF No. 53-8, PageID.1673-1674).

During oral argument, counsel for the association acknowledged that Mr. Lintemuth and Mr. Loos were on the same page regarding the scope of replacement cost coverage during the 2014 phone call and email. The salient point from the association's perspective is that Church Mutual was available to answer the association's questions about its coverage.

### C. The 2017 Renewal

It appears the policy came up for another three-year renewal term at some point around 2017. And around that time, Mr. Loos transitioned off the association's account, and another Church Mutual employee—Beth Kroeger—began handling the account. It was a time of transition for the association too. Mr. Lintemuth moved off the association's board, and another board member—Vicky Welty—took over for Mr. Lintemuth in handling Church Mutual insurance matters.

There is some indication in the record that an introductory handoff meeting may have taken place in August of 2017. To the extent it took place, Mr. Lintemuth did not recall much by way of specifics about this meeting. He testified it was mostly a meeting for the new faces to introduce themselves and for everyone to get a feel of each other. (Lintemuth Dep. 34, ECF No. 53-8,

PageID.1677).  He did not recall a specific discussion about the terms of the policy at this meeting. (*Id.*).  Ms. Kroeger also recalled the August meeting.  But unlike Mr. Lintemuth, she did not recall meeting with Ms. Welty.  (Kroeger Dep. 10, ECF No. 53-7, PageID.1609).  To the extent the meeting took place, therefore, it appears that nothing material to the instant proceedings occurred.

### D. The August 2019 Meeting

Two years later, in August 2019, Ms. Welty (who had at that point had recently assumed the role of president of the association's board) and other board members met with Ms. Kroeger. It appears that the meeting was called because Ms. Welty wanted to review the association's insurance coverage.  (Kroeger Dep. 13, ECF No. 53-7, PageID.1609).

Ms. Welty testified that before the meeting she and another board member—Joel Bair—had a handoff meeting with Mr. Lintemuth.  Ms. Welty came away from the meeting with an understanding that the association was "fully covered" under the existing policy with Church Mutual. (Welty Dep. 21-25, ECF No. 53-11, PageID.1762-1763).  Ms. Welty testified that "fully covered," to her, meant that if something happened to one of the associations' buildings, there was enough money to build it back.  The association's board, she said, all thought that $3.5 million was enough to build a building in the middle of the woods.  (Welty Dep. 56, ECF No. 53-11, PageID.1771).  But she admitted that she never attempted to read or review the actual policy herself.  (Welty Dep. 42, ECF No. 53-11, PageID.1768).

Ms. Welty took her understanding from what Mr. Lintemuth had told her into her meeting with Ms. Kroeger.  Ms. Kroeger called this a midterm "insurance review" because it came during the middle of the policy term.  (Kroeger Dep. 16-17, ECF No. 53-7, PageID.1610).  Ms. Kroeger testified that during the meeting she distributed copies of an "Insurance Review" document that she had prepared.  (ECF No. 53-7, PageID.1634-1649).  Notably on page 9 of the document, the

review listed a number of coverages that were included.  Item 20 provided: "$100,000 for loss of undamaged portion of a building which must be demolished, demolition costs, and increased cost of construction, due to enforcement of building ordinances."  (ECF No. 53-7, PageID.1643).  And Ms. Kroeger testified that she would have gone over this document during the meeting.  Mr. Bair also remembered being handed what appears to have been this document and going over the high points at the meeting, but he did not recall discussing code compliance coverage.  (Bair Dep. 10-12, ECF No. 53-12, PageID.1912).  For her part, Ms. Welty testified that she did not recognize the document and did not recall being given any materials by Ms. Kroeger.  (Welty, Dep. 30, ECF No. 53-11, PageID.1765).  But she did recall Ms. Kroeger going over some type of document.  (*Id.* at 31).

Despite the nebulous recollection, the association's position is that code compliance costs were not discussed at this meeting.  And for purposes of its motion, Church Mutual accepts the association's view that Ms. Kroeger did not go over code compliance costs as part of her insurance review.  But there appears to be no dispute that Ms. Kroeger at least began discussing the policy terms and may have made some recommendations on changes to the policy.  For example, Ms. Welty testified that during the meeting the board members agreed to all of the undescribed recommendations Ms. Kroeger made.  (Welty Dep. 50-51, ECF No. 53-11, PageID.1771).

But at some point during the discussion, Ms. Welty interjected and wanted to get to the bottom line.  She testified that she asked Ms. Kroeger whether the association had complete replacement coverage, and Ms. Kroeger responded that, yes, the association did have such coverage.  (Welty Dep. 67-68, ECF No. 53-11, PageID.1774).  Separately, Ms. Welty told Ms. Kroeger that what the board cared about was whether the association was "fully covered."  (Welty Dep. 47, ECF No, 53-11, PageID.1769).  Here, Ms. Welty did not recall what Ms. Kroeger's

9

response was, but Ms. Welty testified she felt assured from Ms. Kroeger's response that the policy's coverage would be sufficient to rebuild the Miracle Building in the event of loss. (Welty Dep. 56, ECF No. 53-11, PageID.1771).

The meeting concluded, apparently without any change in the policy terms beyond the unspecified changes alluded to by Ms. Welty during her deposition, none of which touched on code compliance costs.

### 3. *The Association Submits a Claim Following the Miracle Building's Collapse*

In March 2020, the Miracle Building collapsed under heavy snow and ice. Ms. Welty, on behalf of the association, subsequently submitted a claim under the Church Mutual policy that covered the period between October 2017 and October 2020, expecting that the insurer would fully pay for the cost of the new construction, minus any deductibles and coinsurance.

Eventually, the association's board discovered that the Church Mutual policy was not sufficient to cover the approximately $3.7 million full cost of constructing a new lodge. The Church Mutual policy provided for up to 90% of replacement costs with a $3,571,200 limit. This was more than enough to cover the estimated $2.4 million replacement cost of the collapsed lodge. But the balance of the actual rebuilding costs were expressly excluded from replacement cost coverage because they were "the increased cost attributable to enforcement of any ordinance or law regulating the construction, use or repair of any property." (ECF No. 53-4, PageID.1324). Similar language was contained in the policy language governing the method of calculating the replacement costs. (ECF No. 53-4, PageID.1325). The policy separately provided for additional coverage relating to the added costs of complying with new building ordinances. (ECF No. 53-4, PageID.1347). But the most the insurer would pay for this added coverage was $100,000, which was not enough to fund all the added expenses. (ECF No. 53-4, PageID.1349).

The association nevertheless went about constructing a new lodge. There is some quibbling over how much of the total construction price would fall under replacement costs and under code compliance costs. It appears the association received a check for what Church Mutual believed the replacement cost was (approximately $2.4 million) and a check for the capped amount of $100,00 in code compliance costs. This was less than what the association says was the total construction cost of approximately $3.7 million. Both sides agree that the specific dollars and cents are not essential to decide the issues here. All agree that the portion of the rebuilding cost attributable to code compliance vastly exceeded the policy's $100,000 cap.

### 4. *The End of the Relationship*

The parties agreed to another three-year term of coverage covering 2020 through 2023. (ECF No. 53-7, PageID.1650-1666). Notably this renewal significantly increased the cap on code compliance costs. (ECF No. 53-7, PageID.1661). This lawsuit appears to have been filed during the tail end of that term (in March 2023).

Thereafter, Ms. Welty testified that they were told in July of 2023 that Church Mutual was dropping their account. (Welty Dep. 34-36, ECF No. 53-11, PageID.1766). The end of the relationship does not appear to be a legal issue in this case.

## PROCEDURAL HISTORY

On March 6, 2023, the association sued Church Mutual in State Court. The Complaint raised six counts, as follows:

- Count I – Intentional Misrepresentation and Fraudulent Inducement
- Count II – Promissory Estoppel
- Count III – Silent Fraud
- Count IV – Negligent Misrepresentation (Regarding Complete Coverage)
- Count V – Innocent Misrepresentation
- Count VI – Negligent Misrepresentation (Regarding Replacement Cost)

(ECF No. 1-2).

11

On April 14, 2023, Church Mutual removed the association's Complaint to federal court based on diversity jurisdiction. (ECF No. 1). The matter proceeded through discovery and on February 14, 2025, Church Mutual filed the instant motion for summary judgment. (ECF No. 53). The basic position of the defendant is that the written policy language controls and the association cannot circumvent that in tort under the economic loss doctrine. More specifically, Church Mutual claims the economic loss doctrine applies because there was no special relationship between the parties. Even if such a relationship existed, the insurer claims, the association did not rely on any statements of Church Mutual and so it says the tort claims must fail.

The association has agreed to dismiss Count VI of its Complaint and confirmed as much during oral argument.[1] The association opposes the motion in all other respects. The Court heard argument on the motion on May 28, 2025, and thereafter took the motion under advisement. The matter is ready for decision.

## LEGAL STANDARDS

Summary judgment is appropriate if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a). Material facts are facts which are defined by substantive law and are necessary to apply the law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Id.* at 252. In deciding a motion for summary judgment,

---

[1] In the withdrawn count, the association claimed Church Mutual made statements following the collapse of the Miracle Building that led the association to believe that Church Mutual would fully pay for the rebuild—notwithstanding the $100,000 code compliance limitation—and that these assurances induced the association into giving their builder the green light to go ahead with the rebuild.

12

the court must draw all inferences in a light most favorable to the non-moving party, but may grant summary judgment when "'the record taken as a whole could not lead a rational trier of fact to find for the non-moving party.'" *Agristor Fin. Corp. v. Van Sickle*, 967 F.2d 233, 236 (6th Cir. 1992) (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

## DISCUSSION

"In a negligence action, a plaintiff must show that the defendant owed the plaintiff a duty, that the defendant breached that duty, causation, and damages*.*" *Cloverleaf Car Co. v. Cascade Underwriters Inc.*, No. 357435, 2022 WL 2182474, at *2 (Mich. Ct. App. June 16, 2022) (quoting *Pressey Enterprises, Inc v Barnett–France Ins. Agency*, 271 Mich. App. 685, 687 (2006)). In its motion, Church Mutual contends it owed no duty to advise the association as to the adequacy of its insurance coverage, but that even if the association could show a duty and a breach of that duty, the association has not identified a triable issue regarding causation. The Court agrees.

1. *Duty*

"In *Harts v. Farmers Ins. Exchange*, 461 Mich. 1 (1999), [the Michigan] Supreme Court clarified the legal relationships between an insurer, its agent, and the insureds and the duty an agent owes to the insured." *Taylor v. Lake Michigan Ins. Co.*, No. 360974, 2023 WL 5494391, at *1 (Mich. Ct. App. Aug. 24, 2023). *Harts* set out as a general matter that under Michigan law, an insurance agent whose principal is an insurance company has no duty to advise a potential insured about coverage limits, except in cases where a special relationship arises between the agent and the insured. *Harts v. Farmer's Ins. Exchange,* 461 Mich. 1, 9-10 (Mich. 1999).

This "special relationship" test is a "very limited" exception to the general rule. *Id.* at 2. A special relationship may arise and trigger a duty to advise when "(1) the agent misrepresents the nature or extent of the coverage offered or provided, (2) an ambiguous request is made that requires

13

a clarification, (3) an inquiry is made that may require advice and the agent, though he need not, gives advice that is inaccurate, or (4) the agent assumes an additional duty by either express agreement with or promise to the insured." *Id.* at 10-11 (internal footnotes omitted). In such instance, the insurance agent may step out from the role of order taker into that of insurance advisor who could advise the insured as to the proper coverage with a corresponding duty to provide the same. *See Zaremba Equip., Inc. v. Harco Nat. Ins. Co.*, 302 Mich. App. 7, 17-18 (2013).

The association sees a special relationship as having arisen from a close, long-term relationship between the association, the youth camp, and Church Mutual. In its mind, all four *Harts* factors are present because Church Mutual misrepresented the extent of the association's coverage by assuring the association that its coverage was adequate; failed to clarify ambiguous requests about "full coverage;" gave inaccurate advice about whether the association's coverage would allow it to rebuild a covered structure in the event of loss; and assumed additional duties by touring the conference grounds and holding itself out as an expert in a niche area of insurance. The summary judgment record, however, reflects that "no event occurred that could or would take this case outside the general rule that [Church Mutual] owed [the association] no duty to advise them about coverage." *Harts*, 461 Mich. at 11.

Much of the association's argument depends on simple good business practice for any insurer that, if it were enough to tag an insurer with liability for risks its policy expressly excluded, would eviscerate the general rule of no duty. That the business relationship endured over the years does not in and of itself create a special relationship, as *Harts* itself recognized. *Harts*, 461 Mich. at 10. Similarly, that the insurer prepared marketing material or conducted onsite review as part of the renewal process did not create a special relationship. Nor is the mere fact that a Church Mutual agent also served as a youth camp board member, in and of itself, dispositive. Indeed, the

association makes little effort to fit these considerations into the *Harts* framework. Moreover, as set out below, even if the insurer assumed a duty by making itself available to answer questions about the association's existing coverage, the association fails to point to any evidence that would show Church Mutual misrepresented or gave inaccurate advice about the association's coverage.

In the main, the association's argument centers around two interactions between the association's board members and Church Mutual agents. The first is Mr. Lintemuth's email exchange with Mr. Loos. But the association has agreed that the two individuals were on the same page regarding replacement cost coverage. Replacement coverage encompassed only what the association already had: nothing more, and nothing less. So, it did not cover all the costs of a new rebuild to new code requirements. Nothing from Mr. Loos' responses would reflect a misrepresentation regarding the association's insurance policy; a failure to clarify an ambiguous request; inaccurate advice; or the assumption of a duty.

Ms. Welty may have believed the policy's replacement coverage included more than that going into her conversation with Ms. Kroeger, but any such misunderstanding was grounded in her own experience in business and her conversation with another board member—Mr. Lintemuth—not anything relayed by a Church Mutual agent. During her interaction with Ms. Kroeger (which constitutes the second of the two interactions the association focuses on) Ms. Welty asked whether the association's policy had replacement cost coverage. Ms. Kroeger responded that, yes, the association's policy did have that coverage. Of course that response was accurate. The policy did include replacement cost coverage. There was no misrepresentation or inaccurate advice. Nor was the inquiry ambiguous in any way because replacement cost coverage was an express provision in the policy. Code compliance cost was a separate and distinct coverage

15

in the policy. The insurer can hardly be faulted for failing to divine what Ms. Welty's subjective interpretation of the provision was.

To the extent the conversation delved deeper into the meaning of such coverage, including Ms. Welty's bottom line question about full coverage, the Court still sees nothing for trial that would trigger a special relationship under *Harts*. To be sure, a request for full coverage can in some cases amount to an ambiguous request. *Harts*, 461 Mich. at 11. But ultimately, Ms. Welty did not recall what Ms. Kroeger's response to this question was other than that Ms. Welty remembered that she was satisfied by what Ms. Kroeger had said. Under these facts, the Court sees nothing for trial on duty.

The Michigan Court of Appeals confronted a similar issue in *Five Waters Props., LLC v. Bone*, No. 366075, 2024 WL 748484 (Mich. Ct. App. Feb. 22, 2024), *appeal denied*, 12 N.W.3d 408 (Mich. 2024). In that case, the plaintiff sought commercial insurance coverage from the defendant. The defendant's agent conducted a walk-through of the property and thereafter procured a policy that had replacement coverage for the equipment using the valuation supplied by the plaintiff. The policy did not include flood insurance and, following loss due to a flood, the insured sued, claiming that a special relationship had been created under the facts of that case. The Michigan Court of Appeals disagreed. Due to the parties' lack of recollection regarding the extent of the request for insurance, the court determined there was no factual support to apply *Harts*. *Id.* at *3. The same result follows here.

To be sure, unlike *Fiver Waters*, the association claims that Ms. Welty made a specific inquiry regarding the adequacy of coverage. But this was not in the context or for the purpose of procuring any new or different coverage; rather, it was to ask about what the existing policy covered. Everyone, including Ms. Welty, had the clear and unambiguous policy terms that

16

excluded code compliance costs from replacement cost coverage, and provided a separate limit for code compliance cost coverage. And the association has failed to come forward with evidence that Ms. Kroeger gave an inaccurate response or description of the policy during the insurance review. At most, Ms. Welty had a favorable takeaway following the meeting. But an impression of full coverage is not enough to create a special relationship under *Harts*. *Id.* at *4.

Accordingly, the Court concludes that no special relationship existed, and so Church Mutual did not owe a duty to the association beyond the obligation to honor the terms of the policy, which it did.

### 2. *Reliance*

Even if a special relationship triggering a duty arguably arose, Church Mutual claims there is no evidence that the association relied on any statements or representations of Church Mutual regarding its coverage. Both sides agree that the various tort claims all contemplate some form of reliance as one of the elements. And for the most part the parties simply repackage their arguments regarding the *Harts* factors as demonstrating reliance, or the lack there of. The association's basic argument is that but for the insurer's representations—culminating in the August 2019 insurance review between Ms. Kroger and board members—the association would have looked for and secured additional code compliance cost coverage.

But the association fails to point to any evidence that Church Mutual led it to believe the insurance policy's replacement coverage provision would provide the association with sufficient funds to rebuild the Miracle Building. Indeed, both Mr. Lintemuth and Mr. Blair testified that they understood replacement costs to be what the policy said they were—getting back what the association had, nothing more and nothing less. (Lintemuth Dep. 15-17, ECF No. 53-8, PageID.1672; Bair Dep. 16, ECF No. 53-12, PageID.1913). And as set out above, there is nothing

for trial that would show that Ms. Kroeger ever conveyed inaccurate advice to Ms. Welty either. Moreover, Ms. Welty could not remember any specific statements from Ms. Kroeger regarding "full coverage" in any event, making it impossible for the association to meet the reliance element.

Accordingly, even if a duty did arise, there is nothing for trial that would show the association acted, or failed to act, on Church Mutual's representations to its detriment.

## CONCLUSION

The association is understandably disappointed in what ended up happening in this case. But the summary judgment record reflects that the association largely understood that replacement cost coverage only covered what was already built. The policy language expressly excluded the added rebuild costs of code compliance from the definition of replacement cost, and church Mutual never said anything to the contrary. Code compliance costs simply did not come up. To the extent the association believed that replacement cost coverage would cover everything necessary to rebuild, despite unambiguous policy language to the contrary, such a belief was not grounded in any misrepresentation or inaccurate advice from Church Mutual. For these reasons, the Court concludes that Church Mutual is entitled to summary judgment in its favor.

**ACCORDINGLY, IT IS ORDERED** that Defendant's Motion for Summary Judgment (ECF No. 53) is **GRANTED.**

This case is **CLOSED.** A separate Judgment shall enter.

Dated:   July 11, 2025                         /s/ Robert J. Jonker
                                                               ROBERT J. JONKER
                                                               UNITED STATES DISTRICT JUDGE